

# THE ATTORNEY GENERAL

## OF TEXAS

WAGGONER CARR
ATTORNEY GENERAL

AUSTIN 11, TEXAS

June 28, 1963

Honorable Fred West
County Attorney
Lubbock County
Lubbock, Texas

Opinion No. C-105

Re: Whether the operator of
a commercial feed lot, who
conducts his business as
outlined, is subject to
the requirements of Arti-
cle 3881e, V.C.S.

Dear Mr. West:

    We quote as follows from a letter addressed to you from
R. K. Harty, a Lubbock attorney, which accompanied your request for
an opinion from this office:

    "It is respectfully requested that you ask
    the Attorney General of the State for an opinion
    as to whether or not the operator of a commercial
    feed lot, who conducts his business in the manner
    outlined below, is required to pay the inspection
    fee, keep the records, and otherwise meet the re-
    quirements of the above statute /Article 3881e,
    Revised Civil Statutes of Texas/which is also known
    as the 'Texas Commercial Feed Control Act of 1957.'
    It is our belief that the operation in question is
    not subject to the statute. . . .

    "The operator in question contracts with the
    owner of cattle to care for and feed them at his
    own place of business, using his own facilities
    and furnishing the necessary labor, supplies and
    feed stuffs. Generally speaking, the cattle are
    fed a mixture of ingredients which the operator
    of the feed lot acquires from other parties and
    mixes in his own machinery, to his own specifica-
    tions. He may, however, on occasions supply the
    cattle with feed which is already mixed by other
    parties, and he may supply some feed stuffs which
    he does not mix, but feeds in conjunction with
    other materials, simultaneously or seriatim. He
    bills the owners of the cattle weekly or monthly,
    on the basis of the cost of the feed stuffs used,
    plus a charge for the use of his facilities and
    the services of himself and his employees. The
    risk of death losses is on the owner of the cattle.

The operator makes no guarantee of results, and
his compensation is not dependent upon the gain
in weight achieved by the cattle, nor upon the
profit realized from their sale. Normally, the
operator uses his own judgment as to the composi-
tion of the mixture fed to the cattle."

Senate Bill No. 18, 55th Legislature, Regular Session,
1957, is codified as Article 3881(a), Vernon's Civil Statutes. This
Act is also known as the Texas Commercial Feed Control Act of 1957.
Section 21 of Senate Bill No. 18 recites the public necessity of the
Act as follows:

Emergency Clause

"Sec. 21. The fact that present laws are
not adequate to regulate the manufacture and sale
of commercial feed in Texas; the fact that raisers
in Texas of livestock, poultry, and other animals
need uniform guaranties and labeling of feeds which
are offered to them; and the further fact that it
would be of great material advantage to have the
laws of Texas conform insofar as practicable with
the present day practices of feeders and feed manu-
facturers, and to afford maximum protection to the
purchasers of feed, create an emergency and impera-
tive necessity. . ."

The Texas Commercial Feed Control Act of 1957 regulates
the manufacture, sale, offering for sale and distribution for sale
of commercial feed as defined in the Act. The regulations contained
in the Act most pertinent to our discussion are summarized as follows:

Section 5. Provides for the registration of each brand
of commercial feed, except customer-formula feed, with the Director
of the Texas Agricultural Experiment Station before such feed is of-
fered for sale, sold or otherwise distributed in the state.

Section 6. Requires manufacturers or other persons, before
selling, delivering, or offering for sale any commercial feed in the
state, except customer-formula feed, to place on the outside of the
container a label bearing detailed information with regard to the con-
tents of the container.

Section 7A. Requires that "persons engaged in the manufacture,
sale, or distribution of commercial feeds or the components of com-
mercial feeds to pay to the Director. . .an inspection fee of Ten Cents
(10¢) per ton on all such commercial feed."

Section 7D. Requires that each person who is issued a permit to sell, offer for sale or otherwise distribute commercial feed and pays the inspection fee in accordance with the tonnage reporting system to maintain and file such records and reports as the Director at his discretion is authorized to require.

Section 13. Declares certain acts to be unlawful. Subsections (b) through (g) of Section 13 of the Act each relate to an activity described as "to sell, offer, expose or distribute for sale. . ." commercial feed not in accordance with the provisions of specifically named sections of the Act.

Section 14. States that the performance of any act declared as unlawful under Section 13 "shall, upon conviction, be guilty of a misdemeanor. . ."

The question of whether a commercial feed lot operator who operates his business as outlined in the facts submitted is subject to the regulations of the Act is resolved by determining if the operator sells, offers, or exposes or distributes for sale commercial feed as contemplated by the Act.

The bailment of animals for the purpose of grazing and pasturing is termed an agistment. Barclay v. Burge, 245 S.W.2d 1021 (Tex.Civ.App., 1952). The relationship of bailor and bailee arises under a contract which provides for the bailor supplying the cattle or other animals of the bailee with sufficient water and grass, Tuttle v. Moody, 100 Tex. 240, 97 S.W. 1037 (1906) for a stated period of time at a designated consideration. Presley v. Cooper, 155 Tex. 168, 284 S.W.2d 138 (1955).

Other than the difference in the primary type of food supplied, we see no distinction between the agistment where the agister provides for the pasturage of cattle or other animals committed to his care on lands owned or controlled by him and the agistment where the agister provides for the care and feeding of such animals in a commercial feed lot under his management or ownership.

When a controversy arises in an agistment as to whether the contract price for pasturage of cattle is in issue, evidence as to the reasonable value of the pasturage for the contract term is admissible. Carver, et al. v. Power State Bank, 164 S.W. 892 (Civ.App. 1914, dism. w.o.j.). In the absence of a contractual provision in the agistment contract concerning remuneration, an agister is entitled to the reasonable value of his services. Crenshaw v. Bishop, 143 S.W. 284 (Civ.App. 1911).

It thus appears that an agistment comes within the rule that where service predominates and the transfer of personal property and the delivery of personal property is merely an incident to the contract, the contract is one for "work, labor and materials" and not one of sale. Bogata Mercantile Co. v. Outcault Advertising Co., 184 S.W.333 (Tex.Civ.App. 1916); Crystal Recreation v. Seattle Association of Credit Men, 209 P.2d 358 (Supreme Ct. Wash., 1949); Perlmutter v. Beth David Hospital, 123 N.E.2d 792 (Ct. of Appeals, N.Y. 1954); and Wm. H. Wise and Co. v. Rand McNally and Co., 195 F.Supp. 621 (So. Dist. New York, 1961).

The term "sale" is defined in 37A Tex.Jur. 38, Sales, Sec. 2 as "a transfer of personal property from one person to another for a price in money or for property of an agreed money value." The same term is defined in Section 1 of the Uniform Sales Act as an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price. Only the most strained construction of the facts submitted could result in a conclusion that a commercial feed lot operator sells feed to the owner of cattle or other animals committed to his care.

There is no point of time at which title to the feed passes from the agister to the bailee. The agister does not contract to sell any particular type of feed, nor is there any time at which the bailee can demand any certain quantity of feed. A contract is not sufficiently certain, to be enforced, if it fails to specify the quantity of goods to be sold or bought and the amount thereof is entirely optional with the seller or buyer. Miller v. Vought and Taylor Const. Co., 345 S.W.2d 852, (Civ.App. 1961, error ref. n.r.e.).

Rule Number 10 of the Rules and Regulations adopted by the Texas Feed Control Service under the Texas Commercial Feed Control Act of 1957 reads as follows:

"Any person who feeds commercial feed to animals pursuant to a contract whereby such commercial feed is supplied, furnished or otherwise provided to such person and whereby such person's remuneration is determined or affected all or in part by feed consumption, mortality, profit or amount or quality of product, is subject to the registration, labeling, sampling, inspection fee and other provisions of the feed law and rules and regulations."

We interpret this rule to include only those situations where a contract of sale exists between a feeder and purchaser of commercial feed for a certain type and quantity of commercial feed

at a fixed price to be fed by the seller to the animals of the purchaser over an agreed period of time. Given this interpretation, Rule 10 has no applicability to the facts at hand. On the basis of the authorities discussed, interpreted in the light of the facts submitted, it is our opinion that the operator of the commercial feed lot in question does not sell, offer, expose, or distribute for sale, commercial feed within the contemplation of the provisions of the Texas Feed Control Act of 1957.

### S U M M A R Y

The operator of a commercial feed lot, who conducts his business as outlined, is not subject to the registration, labeling, inspection fee and other provisions of the Texas Commercial Feed Control Act of 1957 and the Rule Number 10 of the Texas Feed Control Service adopted thereunder.

Very truly yours,

WAGGONER CARR
Attorney General

I. Raymond Williams, Jr.
Assistant

IRW:ms:mkh

APPROVED:
OPINION COMMITTEE

W. V. Geppert, Chairman
John Reeves
Ben Harrison
J. S. Bracewell
Howard Fender

REVIEWED FOR THE ATTORNEY GENERAL
BY: Stanton Stone